Good morning, Your Honors. Christine Bach for the Commission as Appellant. The Commission is splitting opening argument time this morning with eight minutes for opening and two minutes for rebuttal. This Court should reverse the grant of summary judgment on the Commission's retaliation claim for at least two reasons. First, the record evidence is sufficient to show causation between Adam Breaux's participation in the Commission's Anderson investigation and his termination from the company. This is particularly so under this Court's precedent in Womack v. Munson and given that he was questioned about his protected activity just hours before he was fired. Secondly, the record evidence presents a triable issue of pretext here by way of the company's Adam Breaux. First, yes. Let me break in. Sure. The other side emphasized the probable cause finding, which also occurred back near the time of the interview, and I notice I don't think your brief has the words probable cause in it. You wrote good briefs, but you didn't mention the probable cause finding at all. And they say that takes the wind out of the sails of your point because they had known for a year and a month, I think, that there was probable cause finding. Well, there are important distinctions, Your Honor, between a cause determination and a lawsuit. For example, at the time that the Commission makes a probable cause finding, there is still at that point an opportunity for the matter to be resolved via conciliation, which is confidential. It is not, the company is not yet subject to the public scrutiny that comes with a lawsuit. Secondly, there is also the opportunity to resolve the case. Is there conciliation in this case? Conciliation, there is no record evidence of the substance of the conciliation, but conciliation occurred. Yes. Well, now, did it occur during this time period? This time period is very important. As you know, that's the whole issue here, I think. Well, Your Honor, the time period is important, but what is actually critical here and what would allow a reasonable jury to conclude that the company fired Adam Breaux because he had participated in the Commission's investigation is the following, that midday, just hours before he is fired, Adam Breaux is... Now, that's pretty weak because a lot of companies have all kinds of exit interviews and questionnaires and all kinds of stuff. Now, I know this is a family business, but they have a lot of stuff. I think if that's what you're relying on, that's very weak. You need to rely on his... Sorry, you have to bear with me. Sure. But please connect it back to the protected activity, which is his participation in the investigation. Your Honor, the questioning... It's true, Your Honor, that in an exit interview, a number of things will want to be wrapped up. Loose ends will want to be tied. If that were the purpose of that meeting, other things would have been discussed. For example, his performance, his purported performance problems, or the purported delays in the South Plant. That is not what was discussed. The only topic, and this is reflected by both the deposition testimonies of Mark Murphy, the manager, as well as Adam Breaux, the two participants in the meeting, both agree that the only topic of conversation was his questioning. What this evidence shows, Your Honors, is what was on the mind of Mark Murphy when he fired Adam Breaux. What was on Mark Murphy's mind that day was the Commission's investigation, and the fact that Adam Breaux had spoken to the Commission about Dennis Anderson. This is what was on his... A year and a half before then, right? Well, Your Honor, no, this happened within hours of... No, excuse me. The investigation was a year and a half before then. The statement to them was... Correct, Your Honor. You tell me how long it was. How long was it before then? Well, the Commission first interviewed Adam Breaux in June 2008. Okay. Okay? Thereafter, you're correct, Your Honor, a number of months... It'd be 15 months, right, Counsel? And what is notable about those months, Your Honor, is the fact that product fabricators... You'd do better with me, Counsel, if you'd give me some facts. Is it 15 months? It's approximately 14 months, Your Honor. When was the probable cause found? What month? August 2008. And that's 13 months before, correct? Correct. Following that, Your Honor, if you'll permit me... No, no. Now we're going to do some other facts. When was the conciliation? The facts of the conciliation are not in this record, but they happened after that letter of determination was issued. So you're not going to tell us about that? Your Honor, there's no record evidence because this was not an issue before the district court. Okay. So we assume nothing happened between August, the probable cause finding, and next September when he's called in, they talk about it, and fired later in the day. Well, something significant does happen, Your Honor, which is the filing of the Commission's Anderson lawsuit on August 31st, 2009. That's the same day, isn't it, Counsel? No, it's the day before he's fired. That lawsuit is filed on August 31st, 2009. On that day, the Commission notifies the company that it is filing this lawsuit. September 1st, midday, is when Adam Brose questioned... It's in the paper on September 1, right, Counsel? Pardon me, Your Honor? It's in the local newspaper on September 1, right, Counsel? That's correct. Okay. That's correct. And... Is that the first time that they had any reason to know about it? It's in the local paper that day? No. Nicholas Plattson, the Commission's trial attorney, called the company and... When did that happen, Counsel? That happened on August 31st, 2009. Do you know the time it happened, Counsel? I'm not quite sure at what time of the day that that was made. Morning or night? What time of the day? I can consult the record, Your Honor, and on rebuttal provide the specific time. Proceed. Your Honor is correct in noting the significant time that's passed. What's particularly significant about that, though, Your Honor, is that the way that product fabricators treated Adam Brose was more or less consistent without it being treated him before June 2008. That changes once the Commission files its lawsuit on August 31st, 2009. Before then, months had passed. The company could have inquired about the investigation at any point. It did not. It chose on September 1st, immediately following the filing of the lawsuit, to take a number of... A quick succession of actions. First, it calls Adam Brose into a one-on-one private meeting. The only topic of conversation there, as we've discussed, Your Honor, is the investigation. The note that Mark Murphy writes also is about the investigation. And this shows, importantly, what was on Mark Murphy's mind just hours before it fired Adam Brose. This would allow a reasonable jury to conclude that Mark Murphy didn't fire Adam Brose because of performance problems. It fired him because of what was on his mind, which was the Commission's investigation, the lawsuit, and what Adam Brose had told the Commission that apparently had made it subject to this litigation. As to pretext, Your Honor, there is evidence in this record that would allow a reasonable jury to discredit the purported performance problems, which the defendant states were the real reason why it fired Adam Brose. This is because, according to product fabricators on business records, it was its practice well into 2009, the same year that it fired Adam Brose, that it would document performance problems and issue written warnings before it took more serious disciplinary action against the employee, including suspension and, in this case, termination. In this case, in this record, there's absolutely no evidence of any written warning that was issued to Adam Brose for any reason at any time during his employment. This would allow a jury to conclude that it was his participation in the Commission's investigation and not his performance problems that were at issue. Your Honors, I have seen that I've run out of time. I will reserve the rest for rebuttal. Thank you, Ms. Black. Mr. Hendreen? May it please the Court, my name is Jimmy Hendreen. I'm representing Adam Brose. I'd like to take my short time to discuss the disability discrimination portions of the trial court order, and I'd like to tell you that there are two fact issues that the District Court ignored when granting summary judgment. The first was the fact that two or three weeks prior to Adam Brose's termination, he told an officer of the company that he was thinking of having surgery on his shoulder, that the pain was getting too much, he couldn't take any more. The second one was that the same Mr. Murphy had lamented to Mr. Brose that people in the industry were spending too much of the company's money on medical issues. How many employees, counsel, does this outfit have? About. Tell me about. I don't need to know. I'm in the 30 to 60 range. Thank you. Oh, 30 to 60. I thought it was like 30 or 40. No, I don't know. I was asking.  Proceed. Yes. And that these people were going to cost product fabricators a lot of money. Instead of accommodating Mr. Brose, PFI instead fired him. And for no real good reason, as Ms. Beck has discussed and will discuss, because those are where our issues are joined. But wasn't there purported reason based on his performance and the performance of his department? Yes, Your Honor. And what's the evidence that that was pretextual? Adam Brose's own opinion that he had been, well, there's a number of pieces, but the best one is Adam Brose's own opinion of his department handling in that he said he was doing a fine job. That's a fact in the record. That particular fact is the case law we cited, Your Honor, is enough to go past summary judgment. But there's more. There is the fact that nobody ever told him he was doing a bad job. Nobody ever said, Adam, you know, you're not doing enough. And if you're not going to do what you're supposed to do, you're going to be fired. I mean, that's a tenant of employment law. And it is a particular part of pretext when you say after the fact, a subjective reason, hey, he wasn't doing enough. Okay, well, I think we can take that to a jury, Your Honor.  The issue that the district court talked about with respect to reasonable accommodation, the district court also missed a piece of that. The district court suggested that Mr. Brose didn't ask for an accommodation. When he said, I'm going to the doctor, I'm thinking I'm going to have surgery. The doctor had already discussed surgery with him, and now he's telling product fabricators that he's going to go have a talk about surgery to the doctor. It's at that point that he gets fired. And the district court unfortunately suggests that an unlimited amount of leave time is unreasonable. And it also says, well, he didn't really ask for an accommodation. And that's, I think, the more salient point. And I think the district court's cutting that onion a little too thin, Your Honors. I think that what we're doing is we're rewarding the company here for getting ahead of the game and saying, well, you know, it's just a matter of time. His doctor's already talked about surgery. He's going back for what is in essence a pre-surgery consult. He's going to have time off. Let's just cut this one off right now. And that's fine if there's a good reason to do it, but there isn't. I'm sorry, Your Honor. Wait. He'd had surgery of the same kind on another shoulder, had he? No, Your Honor. This was the right shoulder. Wrong shoulder. It was the right shoulder. He was also having some problems with the left shoulder. It gets confusing. But the right shoulder is one he was going to have surgery on. And the left one then he was going to, you know, he was also having problems with. I'm going to reserve what little time I have left for rebuttal. Thank you, Mr. Andrew. Thank you. Ms. Garbus. May it please the Court. I'm Marlene Garbus, and I'm here representing the appellees, Product Fabricators, Inc., and M&M Manufacturing. I'm just going to refer to them as PFI. And I want to start out responding to the appellant's argument on the retaliation, the alleged retaliation of PFI against Breaux in violation of Title VII, because this Court should find there's no causation. Counsel, don't we have two possible causes here, one being his bad performance and the other being his talking to the EEOC? And if you've got two causes, surely that's enough to get to a jury. No, Your Honor. First of all, we don't have his talking. Let's talk first of all, because that's the first argument that counsel for appellant, the EEOC, suggested. And that is whether we retaliated against him. And here's what happened. The key facts are this. Adam Breaux participated in an EEOC investigation on June 24th of 2008. On August of 2008, the EEOC advised Product Fabricators that it had probable cause to find that Product Fabricators had discriminated against Adam Breaux. Excuse me, Dennis Anderson, excuse me. Nothing happened. On September 4th of 2008, just a few months later, Adam Breaux had reported a work-related injury. From that time forward, until Adam Breaux was terminated on September 1st of 2008, PFI complied in all respects with the accommodations that Adam Breaux required. Do you agree with the other side, there was conciliation going on after the probable cause? There may have been a short period of conciliation. There was not conciliation ongoing. Absolutely not. Because... This is not in the record, anything about the conciliation. There's nothing in the record about conciliation, but I can tell you that we didn't have a long, there was no long period of conciliation, if that's what the court... Go back to my two-cause issue. Why isn't having a cause... Are you familiar with this court's Young-Losey case? That's the one where the supervisor wads up the protected communication, throws it in the wastebasket and says, you're fired. And the district court said, oh, there were other reasons, and we said, well, you wad it up and throw it in the wastebasket. Surely there's, you know, that's good enough for retaliation. This seems like the same kind of case to me where you're talking about it right before you fire them, and let the jury figure out which cause works. No, absolutely not, Your Honor. Because the EEOC is trying to say that the intervening event here was the filing of the lawsuit of Dennis Anderson on August 31, 2008. Adam Breaux had no vested interest. He was named a party in the lawsuit. That lawsuit had nothing to do with his protected activity. It upset the Murphys, though. Well, what upset the Murphys was the EEOC investigation. Correct. The lawsuit upset the Murphys. And couldn't they think, he must be telling us a fib, he ratted us to the EEOC? Absolutely not. Well, why absolutely not, counsel? Because Adam Breaux had recommended, he was a direct supervisor of Dennis Anderson. He recommended that Dennis Anderson be terminated prior to the time he was. So he already knew that. There's also evidence in the record that he talked to Adam Breaux after the investigators. Mark Murphy had talked to the investigators previously and said, basically, how is the process going to go? What are you going to ask? He said, we're just going to ask about policies and procedures. You're not going to ask about any named persons. No, we're not. They misrepresented that. That's what Mark Murphy was upset about. Are you talking about the acknowledgment? They were upset about the lawsuit, counsel, more important. It makes the paper. It makes the newspaper. There's no evidence in the record that they ever saw the newspaper. Counsel, there's evidence. They said their suppliers were upset. The district court says that they were told by their suppliers they were upset. You did something wrong. No, let's be clear here. There's no evidence in the record as to when the suppliers talked to PFI, told them about that. There's no evidence in the record that PFI ever saw the newspaper article that was in the Star Tribune article. They talked about a media blitz. There was no such thing. There's no evidence. All that there's evidence is that the EEOC put an article in the newspaper. But there's no evidence that PFI ever saw it prior to terminating Adam Breaux. Do you know when the call was the day before the lawsuit? What time of the day was it? I don't know exactly the time of day, but I can tell you. Here's what I can tell you. Nick Plassen in his declaration said he called the PFI and left a message with the receptionist. In his declaration, he said, but we don't know what message that was given from the receptionist to Mike Murphy Sr. And all we know is this. Mike Murphy Sr. testified in his deposition that when I got the message on September 2nd, I called back Nick Plassen and left a message for him. I said, I'm returning your call. There's no evidence that they ever spoke. That's all we know. Do you know what the initial message was? Was it a message, suit's been filed, or call me, or what? But Nick Plassen, all we know from the declaration is that Nick Plassen said in his declaration that he called and left a message with the receptionist that the EEOC has filed a lawsuit and please give this message to Mr. Murphy and have him call me. But that doesn't mean that Mr. Murphy got that message any sooner than September 2nd. So I don't think there's any connection there. I mean, it's nice to try, but there's no connection there between the lawsuit, which is deemed to be an intervening event, and the fact that Attenborough was terminated on September 1st. And let me just talk about the acknowledgement for a minute, because I think that was brought up as well. This acknowledgement was not about the substance of the protected activity. Are they trying to make it sound like it is? All it was was, I just want a confirmation. If you look at the record, Mark Murphy had been concerned about the EEOC misrepresentation. Knowing he plans to terminate Attenborough, he wanted to have something for the record that, in fact, the EEOC did what they weren't supposed to do. It's about the protected activity, though, counsel, right? It's not the protected activity. Oh, goodness gracious. The protected activity is if they had discussed it. The protected activity is the interview, and he asked about the interview. That's right. That's about the protected activity. That's like throwing the complaint in the wastebasket. That's a direct counsel. Go ahead. I would distinguish it from WOMAC, for example. That's a case they rely upon. In WOMAC, they asked about the substance of the claims. What claims did you have in your lawsuit? That's not at all. It's not at all what we have here. All we have, if you look at, you can look at the acknowledgment itself. There's nothing about any of the questions that were asked, what the discussion was with the EEOC. That would have been an invasion into a protected activity. That isn't what we have in this case. Any other questions on that? What was the purpose for the statement? The acknowledgment? I guess that's what you'd call it on September 1st. The purpose of the acknowledgment was that PFI knew that they were going to be terminating Mr. Burrell. They wanted to have a complete record because Mr. Murphy, Mark Murphy, had been very concerned about EEOC's misrepresentation and he wanted to perhaps do something with that. That's all that was. Just to close up the file. It's a good jury argument, but don't you think you could also think that the Murphys are pretty mad at this point on this day? Isn't that a reasonable inference favorable to them who lost the case that this is not a happy day at PFI? Well, you're making the assumption that they knew that there was a lawsuit. We don't have that. Well, there are two ways. One, we don't know that, but even if they knew they had put in place before that in July of 2009 because they were concerned about Adam Burrell's poor performance, they had already posted an ad in the paper for to hire a new employee. If we look at the Wright v. Van Vincent case, they had made that decision previously and they knew about it. That shouldn't make a difference because it was already in process to terminate him. The EEOC's position is that Mr. Burrell's cooperation with the EEOC 15 months earlier was the reason that he was terminated in retaliation for that act 15 months before. That's correct. We're looking at timing and they're trying to connect the timing to this event, the intervening event of the lawsuit. There's absolutely no legal authority on point. This would be a case of first impression for this circuit to say for this... Are you familiar with the Young-Losey case? Well, I don't think it's exactly the same. I mean, you're talking about the waste bag. No, no, I'm not trying to ambush you. Are you familiar with the Young-Losey case? I'm not. No, I'm not. Okay, that's okay. Well, write us a letter if you find Young-Losey like this case or not like this case. I will. 28-J under federal rule of law. Putting that aside, there was no legal authority that we could find that actually stood for that same proposition. When we have these facts in place that PFI knew that he participated in the protected activity, they knew that Adam Breaux had recommended that Dennis Anderson be terminated, that they had complied with all of the restrictions and medical care required by Adam Breaux during the time when he reported his work-related injury. And also, not only that, as part of that, they promoted him and put him in a different position in a supervisory capacity. He was doing well up until a few months, until the spring of 2009. And then they got complaints. An employer has a right in terms of to execute his business practices. This court does not sit as a super-personnel department to make those decisions, even if the decisions aren't always accurate. But, in fact, if this court is going to say that an acknowledgment and the fact that intervening events such as affects a third party, because they knew there was probable cause, you can't even look at conciliation that's not in the record. That would open up the floodgates in terms of what could happen. That wasn't the purpose behind Title VII. And so we asked the court to consider that and to find that there was no pretext. There was no causal relationship. You don't even have to go to pretext. Between the protected activity and Adam Breaux's termination. He was terminated for poor performance. Was there any indication in the lawsuit that was filed that Mr. Breaux had helped out or had been cooperating with the EEOC in their lawsuit in between these events? Absolutely not. There's nothing in the lawsuit relating to Adam Breaux. This is Dennis Anderson's lawsuit. This is a lawsuit of a and it looks like my time, I have reserved my time. But no, so there was nothing in the lawsuit. You don't have a cross appeal deed. I do not. Then I can just finish. This is your time. No, there was nothing in the lawsuit. I'm sorry. I wasn't thinking. Related to Adam Breaux. So I think we've got to look at that very carefully. And I think you're right about acknowledging you've got to look at it carefully, what it was, what its purpose was, what the evidence in the record is about it. You can't create something out of speculation. That's exactly what the EEOC is trying to do. Inference upon inference upon inference based on what? There's no facts in the record to support it. And you know, maybe it's suspicious. This court has looked at other cases similarly. You looked at Wright v. Van Vincent. Recent decision. But still upheld for the employer that termination was appropriately terminated the employee. I do want to address for a minute if there are no further questions on this. We could talk about pretext, but Mr. Andreen has talked about a disability discrimination on two the court ignored the fact first of all, his claim that we discriminated against Adam Breaux because he had a disability in violation of the ADA. What's clear in the record, the record is clear that Adam Breaux did have conversations with Mike Murphy Jr. and Mark Murphy. But the record establishes this. This conversation with Mike Murphy. He said, I have some left shoulders bothering me. Mike Murphy's response was go home and see how it is over the weekend. I'll talk to you next week. On the next business day he approached him and asked him how the shoulder was. He said okay. Secondly, and this also relates to his claim for accommodation or to initiate the interactive process. With regard to Mark Murphy, he asked him about, he was going to see mentioned he might need to take a leave. Mark Murphy didn't know how much time he could take. Adam Breaux said I'll get some information from the doctor. He never got any information. That's also clear in the record. So we don't have a situation here where there's any substance to the fact that we discriminated against him. He was terminated specifically for poor performance. Looking at the record you can see, as I've stated on and on, that it shows that we accommodated him for his work report injury. My time is up. Thank you very much. Thank you, Ms. Andreen. Excuse me. Ms. Garbus, I'm sorry. Excuse me. Your Honours, there are a number of factual disputes that are made clear by the oral arguments this morning and in the briefs. Mike Murphy Sr., the President of PFI, testified that when he learned of the lawsuit, his reaction was that   who was being distributed to him. He said, quote, he was very concerned. As we discussed earlier, Your Honour, the public nature of the lawsuit upset Mike Murphy Sr. Counsel, do you know when he learned about it? Well, record evidence would allow the reasonable inference, Your Honour, that PFI was aware of the lawsuit on August 31, 2009 when Nicholas Platson called the Commissioner Attorney called the company to relay the news that it had filed a lawsuit against the company. Do we know what time he called? The record evidence is not clear on that point. Presumably, it would be during the business day, Your Honour, from 9 to 5, and the meeting that occurred where Adam Breaux was questioned about his EEOC participation was midday September 1st, the next day. That in itself is evidence to suggest that the company was aware of the lawsuit. Why would it then be prompted to question him after having months, having passed since the investigation? Mr. Murphy Sr. was not the person that terminated Mr. Breaux, right? Well, that's correct, Your Honour. Mark Murphy was. As I read the record, the company had been in hard times, and the two younger Murphys had taken over and were essentially managing it, and Mr. Murphy Sr. was fading into the sunset, so to speak. Is that right? That's correct. That has no bearing... But it was Mr. Murphy Sr. that got the message on the date that you said. All of the Murphys, Your Honour, were... This is a small family company. The Murphys work closely together. The Murphy brothers work closely with Mike Murphy Sr. Certainly the president of the company is an appropriate contact to relay the information. In any event, the record evidence shows, and it would allow reasonable inference, that the company was well aware that it was being sued. In fact, the commission had called, personally notified the company that it was being subject to a lawsuit. And that inference is supported by the midday meeting we discussed earlier, in which he specifically and expressly questioned about it, and asked to sign what the defendants are calling an acknowledgement, but which a reasonable jury could draw a different conclusion. That is, what was on the Murphys' minds when it fired Attenborough was not his poor performance, but was the fact that he had participated in the Anderson investigation, and whatever he had told the commission had made it subject to the jury. I see that I'm out of my rebuttal time. Does it usually take the EEOC 15 months to put together an action like this? I mean, the inference, the reasonable inferences that you want to make is that there was something that Mr. Brough told him 15 months before that was the grabberman that brought this suit on, and so forth. But this is, does it take 15 months for you folks to wamp up a lawsuit like this and get it filed? Well, for the purposes of analyzing the retaliation claim here, Your Honor, it's the commission's theory of this case is that it's the commission's lawsuit which prompted the defendant to retaliate against Mr. Brough for having assisted in the investigation that culminated in the lawsuit. In terms of commission practice as to how long an investigation will last, there are a number of considerations, Your Honor, that will shape the speed of the investigation and the nature of the investigation. We shouldn't, as a court, take any reasonable inferences as to that time frame and so forth. In terms of developing the litigation for the lawsuit, no. Yeah. Any further questions, Your Honor? Thank you. Thank you, Ms. Mack. Mr. Andrean, I think you've got a minute or two, or a few seconds. We'll give you a whole minute. Thank you, Your Honor. I want to address a couple things Ms. Garvis said and maybe a couple things that I didn't say. There is some misunderstanding, I think, by the trial court in this case saying Mr. Brough's original injury was in 2008 and that over a year passed before he was terminated, but that doesn't acknowledge the statements that Mr. Brough made just before he was terminated. Temporal proximity, as the court knows, under the Peterson and Springer case, can be a mere matter of weeks and that's all that's needed to survive summary judgment. The court ignored that. I also want to point out that PFI had warned numerous persons before they terminated these employees. It never warned Adam Brough once, which is the best establishment of pretext that I can think of. Thank you, Your Honor. In that regard, though, wasn't there some evidence that they had had a person in charge of those things and as they shrunk down because of bad business, they didn't have those things? But, in fact, afterwards the PFI did continue to warn its employees, and what PFI will tell you is that while those were different types of things, not just run-of-the-mill performance, which, again, I think is cutting the onion too thin. Thank you, Your Honor. Thank you, Counsel. The court wishes to thank all the attorneys for their presence and argument this morning. We also thank you for the briefing which you've submitted. Consider these cases, this case submitted, and we'll render a decision in due course. Thank you. May be excused.